# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| STEPHEN HUGUELEY, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) NO. 3:19-cv-00598 |
| | ) JUDGE TRAUGER |
| TONY PARKER, et al., | ) |
| Defendants | ) |

## MEMORANDUM AND ORDER

The defendants filed a Motion for Summary Judgment (Doc. No. 31), to which the plaintiff filed a Response (Doc. No. 59), and the defendants have filed a Reply. (Doc. No. 66.) The plaintiff was permitted to file a sur-reply (Doc. No. 72), the substance of which the defendants dispute in a motion that the court will effectively consider as a sur-sur-reply. (Doc. No. 71.) For the reasons set out herein, the Motion for Summary Judgment will be denied.

## I. BACKGROUND AND ASSERTED FACTS

The plaintiff is an inmate on death row at Riverbend Maximum Security Institution (RMSI). He sues the defendants for violations of his constitutional rights in connection with his prolonged detention in solitary confinement. The defendants assert that this case must be dismissed without prejudice because the plaintiff failed to exhaust his administrative remedies before filing suit, as required by the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e. Specifically, that statute provides that "[n]o action shall be brought with respect to prison conditions . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." *Id.* § 1997e(a).

All inmates on death row at RMSI are automatically classified as maximum-security inmates. (Doc. No. 67-4 at 22, 29.) Death row inmates are further divided into levels that determine the degree of restrictions or privileges to which they are entitled: A, B, or C. (*Id.* at 23; Doc. No. 67-3 at 12–14.) It is undisputed that the plaintiff has been confined as a Level C death row inmate, which is "the most restrictive form of incarceration on death row," since 2002. (Doc. No. 12 at 2; Doc. No. 33 at 2.) His Level C status is routinely evaluated in Unit Level Review Panel Hearings, which typically occur on a monthly basis. (Doc. No. 12 at 4.) The plaintiff cooperates with those hearings and has not been formally charged with any disciplinary offense since 2015. (*Id.*) The Unit Review Panel that conducts those monthly hearings has repeatedly recommended that the plaintiff's status be changed to Level B, which would result in more privileges and fewer restrictions. (*Id.*; Doc. No. 48 at 30–49.) However, the defendants, acting in their roles as Unit Manager and Warden of the prison, have consistently disapproved those recommendations and maintained the plaintiff's status at Level C. (Doc. No. 48 at 30–49.)

The defendants assert twenty-one facts in support of their motion for summary judgment, but their position ultimately boils down to a single material fact, which they claim is undisputed: that before he filed the Complaint in this case, the plaintiff did not file any institutional grievances that "raise or address with any specificity the 14th amendment due process issues and 8th amendment condition of confinement issues alleged in the instant Complaint." (Doc. No. 32 at 2.) The plaintiff disputes that assertion and contends that a grievance he submitted on February 25, 2019, and an appeal he submitted on April 3, 2019, both adequately raised his current claims for the purpose of satisfying the PLRA's exhaustion requirement. (Doc. No. 60 at 2–4.)

The plaintiff further asserts that he is excused from the exhaustion otherwise required by the PLRA because an administrative remedy to challenge his Level C status is unavailable in the

2

institution, the administrative scheme is so opaque that it is incapable of use, and prison administrators have thwarted his use of the administrative process by misleading him about its availability. (Doc. No. 59 at 11–18.) Along with his response to the defendants' statement of facts, the plaintiff asserted seventy-eight counter facts, many of which implicate exceptions to the exhaustion requirement. (Doc. No. 60 at 29–40.) Before the court addresses those facts, however, it must resolve a procedural issue concerning the defendants' failure to respond to them.

The defendants state that they "elect not to respond" to the plaintiff's counter facts and choose to "rely upon the evidence in the record" instead. (Doc. No. 66 at 12.) The defendants' first offered reason for the failure to respond is that the plaintiff's counter facts rely largely on his own Declaration. (*Id.* at 6.) The defendants complain that the Declaration is "unsworn" and argue that "[i]t is fundamentally and egregiously unfair" to permit the plaintiff to rely on it "without any other support or citation to the record." (*Id.*) But, as the plaintiff correctly points out (Doc. No. 72 at 3), the Federal Rules of Civil Procedure expressly authorize the consideration of declarations in connection with motions for summary judgment. Fed. R. Civ. P. 56(c)(1)(A) & (c)(4). Moreover, the plaintiff's Declaration expressly asserts that it is based on his personal knowledge, is signed and dated, and concludes by stating "I declare under the penalty of perjury that the foregoing is true and correct." (Doc. No. 61 at 10.) Accordingly, it has "like force and effect" as a sworn affidavit as a matter of law. *See* 28 U.S.C. § 1746. Thus, the defendants' objection to the form of the Declaration is legally baseless.

Second, the defendants complain that the plaintiff has failed to execute a HIPAA waiver, which deprives them of the opportunity to "seek and assess medical evidence" or address the medical evidence the plaintiff has submitted. (Doc. No. 66 at 6–7.) But a review of the plaintiff's asserted counter facts (Doc. No. 60 at 29–40) does not reveal any need to obtain or rely on medical

3

records to respond to the vast majority of them. Only counter facts 73 and 78 (*id.* at 39–40) touch on the plaintiff's healthcare. Even if the defendants believe they lack access to the facts necessary to respond to those assertions, that is no justification for failing to respond to the plaintiffs' counter facts in their entirety.

And third, the defendants complain that the plaintiff's reliance on evidence about the experience of a fellow Level C death row inmate, Jon Hall, is improper because that information was outside the scope of discovery. (Doc. No. 66 at 7.) The court previously limited discovery in this case to "any discovery that is directly relevant to the issues of exhaustion and the availability of administrative remedies to the plaintiff." (Doc. No. 46 at 4.) During Warden Mays's deposition, counsel for the plaintiff presented Mays with a copy of a grievance filed by Hall about his level review. (Doc. No. 67-4 at 94–98; Doc. No. 68-8.) The grievance was returned to Hall by the prison grievance chairperson with the explanation that "[c]lassification matters/institutional placements are inappropriate to grievance procedure," followed by a citation to policy. (Doc. No. 68-8 at 4; Doc. No. 67-4 at 95.) Counsel for the defendants lodged a standing objection to any questions about Hall as "outside the scope of the Court's order," (Doc. No. 67-4 at 94–95), and now argue that the court should sustain their objection and refuse to consider the evidence in question. (Doc. No. 66 at 7.) It is difficult to see how the procedural rejection of a grievance about continued Level C status is not relevant to the availability of administrative remedies for such continued confinement. At least for present purposes, the court finds that the defendants' objection is without merit. But even if the defendants' discovery objection had merit pursuant to the court's limited discovery order, that would not make the facts in question inadmissible. In this instance, the plaintiff clearly obtained Hall's grievance documents outside the discovery process and relies directly on the documents rather than Mays's testimony about them. (Doc. No. 60 at 33; Doc. No.

4

61-8.) The defendants offer no reason why they cannot or should not respond to the plaintiff's counter facts with regard to Mr. Hall's experience. Moreover, the defendants' refusal to respond to the plaintiff's counter facts on the basis that two of the seventy-eight facts asserted concern Mr. Hall would be unwarranted even if those facts were objectionable.

Finally—BUT IMPORTANTLY—it is not within a litigant's prerogative simply to "elect" not to comply with the rules of this court. Those rules plainly provide the following:

> If the non-moving party has asserted additional disputed facts, the moving party **must** file a reply statement responding to each of the additional disputed facts. The reply statement of the moving party **must** be filed within fourteen (14) days of the filing of the response of the non-moving party.

Local Rule 56.01(d) (emphasis added). Given the defendant's conscious refusal to comply with this rule, the court will deem all of the plaintiff's counter facts "undisputed for purposes of summary judgment." Local Rule 56.01(f); *see also* Fed. R. Civ. P. 56(e)(2) (providing that the court may "consider the fact undisputed for purposes of the motion" if a party "fails to properly address another party's assertion of fact").

Among those facts and the evidence underlying them, the court considers the following to be the most pertinent to the pending motion:

- TDOC policy "explicitly prohibit[s] the use of the grievance process to address matters relating to security classification and institutional placement." (Doc. No. 60 at 31, ¶ 16.) Specifically, TDOC Policy #501.01(VI)(H)(3) provides that inmates may not use institutional grievances to address "classification matters such as institutional placement and custody level, which may be appealed through other avenues outlined in the TDOC #400 policy series, except where policy violations are alleged" but that "[c]ell assignments not due to a classification or reclassification are grievable." (Doc. No. 61-2 at 18.)

- Warden Mays personally told the plaintiff that level changes and related privilege issues were non-grievable and that the plaintiff's only option for a level change was to remain patient and discipline free. (Doc. No. 60 at 31, ¶¶15, 17; Doc. No. 61 at 3, ¶¶ 16, 18.)

- Another Level C death row inmate, Jon Hall, attempted to challenge a monthly unit level review decision through the grievance procedure, and his grievance was

5

returned as "inappropriate to grievance procedure." (Doc. No. 60 at 33–34, ¶¶ 40–41; Doc. No. 21-8.) The rejection of that grievance as non-grievable occurred in January 2019 and was apparently approved by Warden Mays and a TDOC Acting Assistant Commissioner in February 2019. (Doc. No. 21-8 at 4, 8–9.)

- Since filing this lawsuit, the plaintiff has had two related grievances rejected as non-grievable.[1] (Doc. No. 60 at 33, ¶ 39.) In the first, dated September 26, 2019, he complained that being deprived of all privileges for 17 years and having to hear the laughter and group activities of other inmates nearby was psychological torture. (Doc. No. 61-9 at 2–3.) That grievance was rejected within days with an Inappropriate Grievance Notification stating that "[c]lassification matters/institutional placements are inappropriate to grievance procedure" and citing the policy provision quoted above. (*Id.* at 4.) In an email and a supervisor response dated October 10, Defendant Keys wrote that the plaintiff's grievance was "inappropriate due to the fact that inmate placement is not grievable." (*Id.* at 7–8.) The second grievance, dated October 20, 2019, again complained that the plaintiff was suffering psychological, emotional and physical harm from being confined in "segregation/solitary confinement housed in a pod with A-Level death row prisoners" where he could hear their activities. (Doc. No. 64-1 at 1–4.) This grievance was also rejected as non-grievable because it was a "classification matter." (*Id.* at 6–15.)

- The plaintiff filed a grievance on February 25, 2019, in which he complained that he had "apparently been permanently excluded" from moving up from his current level of confinement and that the circumstances of that confinement constituted "Cruel and Unusual Punishment that has caused [him] both psychological and emotional trauma, that has in turn led to [his] declining physical health." (Doc. No. 60 at 34–35, ¶¶ 46–49; Doc. No. 61-10.) He asserted that "**IF** the individuals herein NEVER intend to give me a level and access to the programs/activities and benefits of those levels, it is clearly discrimination, and a violation of the 1964 Civil Rights Act." (Doc. No. 61-10 at 9.) The plaintiff labeled the grievance as a Title VI discrimination grievance in an effort to circumvent the prohibition on ordinary grievances about classification matters. (Doc. No. 60 at 34, 38, ¶¶ 44, 63–64; Doc. No. 61 at 6, ¶¶ 40–42.) Prison staff rejected the grievance upon determining that it did not constitute a Title IV grievance concerning discrimination on the basis of race, color, or national origin. (Doc. No. 61-13 at 4.) The plaintiff appealed the rejection. (Doc. No. 61-14 at 2.) His appeal complained that "[t]he response was basically a non-response in that no one responded to the fact that I am being denied

---

[1] These post-filing grievances cannot be considered to satisfy the PLRA's exhaustion requirement, because the statute requires exhaustion BEFORE a complaint is filed. *Freeman v. Francis*, 196 F.3d 641, 645 (6th Cir. 1999) ("The plain language of the statute makes exhaustion a precondition to filing an action in federal court ('No action shall be brought . . . until such administrative remedies as are available are exhausted.'). The prisoner, therefore, may not exhaust administrative remedies during the pendency of the federal suit.") (internal citations omitted). They are relevant, however, to the question of whether an administrative remedy is available to address the plaintiff's claims.

6

- access to programs, activities and the benefits of those programs and activities." (*Id.*) He provided express notice that he was "appealing to satisfy any and all requirements by the courts in which this issue <u>WILL</u> be raised." (*Id.*) The plaintiff's "appeal was rejected without any meaningful review of the substantive issues raised." (Doc. No. 60 at 37, ¶ 56; Doc. No. 61 at 8, ¶ 48.[2])

- The plaintiff asked prison counselor Warren Tate several times over the course of four years if there were any forms with which he could appeal the results of his monthly Unit Level Panel Reviews. Tate repeatedly advised him that no such forms existed. (Doc. No. 60 at 37, ¶¶ 57–58; Doc. No. 61 at 4, ¶ 29.) "Defendant Mays testified [at his deposition] that he was unaware of any policy or form for appealing monthly unit level review decisions because he believed the issue was covered" by the ordinary grievance procedure. (Doc. No. 60 at 37, ¶ 60.)

- In fact, "[i]nmates are required to use 'Classification Appeal, [form] CR-3004'" rather than the ordinary grievance procedure to appeal unit level panel review decisions, according to TDOC Policy 503.03(VI)(J), which provides as follows:

  > Program level assignments recommended by the unit review panel are subject to the approval of the unit manager and Associate Warden of Security. . . . Any level change from Level C requires the approval of the Warden. Inmates may appeal from final decisions using Classification Appeal, CR-3004.

  (Doc. No. 60 at 37, ¶ 61; Doc. No. 60-1 at 3.)

- On April 3, 2019, the plaintiff submitted a document to Defendant Mays titled "Death Row Level Review Appeal for March 2019," on which he copied several people, including Defendant Kays and counselor Tate. (Doc. No. 61-6 at 2–4.) In the document, he explained that because Tate had told him there was no form for appealing level reviews, he was submitting his own document "to satisfy the courts [sic] requirement for me to attempt to resolve this matter before pursuing a resolution in court." (*Id.* at 2.) The plaintiff went on to complain of the unfairness of his continuing to remain at the same level when he had not had a disciplinary infraction in four years and characterized his circumstances as cruel and unusual punishment and a violation of due process. (*Id.* at 2–3.) He concluded by saying that he "should be allowed to have a level" or at least to have more privileges than he had. (*Id.* at 4.) Nobody ever responded to this appeal. (Doc. No. 60 at 38, ¶ 66; Doc. No. 61 at 4, ¶ 29.)

- Over the course of several years, the plaintiff and his attorney attempted to negotiate with Defendants Mays and Keys for a level change or other compromise that would result in additional privileges, none of which resulted in any change in his circumstances. (Doc. No. 60 at 31–33, ¶¶ 13, 19–28, 32–35; Doc. No. 61 at 3–5, ¶¶ 19–34; Doc. No. 61-4; Doc. No. 61-7; Doc. No. 61-10 at 10–18.)

---

[2] There are two paragraphs numbered 48 in the plaintiff's Declaration. (Doc. No. 61 at 8.) This reference is to the second such paragraph.

7

## II. LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249, 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

The United States Court of Appeals for the Sixth Circuit has explained the application of this standard to motions for summary judgment based on the alleged failure to exhaust under the PLRA:

> Because the Defendants bear the burden of proof on exhaustion, they bear an "initial summary judgment burden [that] is higher in that [they] must show that the record contains evidence satisfying [their] burden of persuasion" and "that no reasonable jury would be free to disbelieve it." *Surles* [*v. Andison*], 678 F.3d [452,]

8

> 455–56 [(6th Cir. 2012)] (internal quotations omitted). We further analyze whether an inmate has made "affirmative efforts to comply with the administrative procedures" and "whether those 'efforts to exhaust were sufficient under the circumstances.'" *Risher* [*v. Lappin*], 639 F.3d [236,] 240 [(6th Cir. 2011)] (quoting *Napier v. Laurel County*, 636 F.3d 218, 223–24 (6th Cir. 2011)). A district court should grant summary judgment only if a defendant establishes that there is no genuine dispute of material fact that the plaintiff failed to exhaust. *Id.*

*Does 8-10 v. Snyder*, 945 F.3d 951, 961 (6th Cir. 2019).

### III. ANALYSIS

#### A. Whether the Plaintiff Was Required to Exhaust Administrative Remedies

As quoted above, the PLRA requires the exhaustion of "such remedies as are available" before inmates sue to challenge conditions of confinement. 42 U.S.C. § 1997e(a). By definition, then, an inmate "need not exhaust" when a prison's "grievance process is, in practice, unavailable." *Snyder*, 945 F.3d at 963.

The United States Supreme Court has identified three circumstances in which an administrative remedy "is not capable of use to obtain relief" and in which "an inmate's duty to exhaust 'available' remedies does not come into play." *Ross v. Blake*, 136 S. Ct. 1850, 1859 (2016). First, exhaustion is not required where an administrative procedure is a "dead end," such as where the office to which prisoners are told to submit a grievance "disclaims the capacity to consider those petitions" or where "officials have apparent authority, but decline ever to exercise it." *Id.* In those circumstances, there is no potential for relief and "no obligation to exhaust the remedy." *Id.* Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* When a remedy scheme is so confusing that "no ordinary prisoner can make sense of what it demands—then it is also unavailable." *Id.* And third, a remedy is unavailable for the PLRA's purposes "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860. This

9

includes "instances in which officials misled . . . inmates so as to prevent their use of otherwise proper procedures." *Id*.

The plaintiff argues that the facts summarized above establish all three of these circumstances. First, he argues that the routine rejection of grievances about level classification or placement in solitary confinement as non-grievable establishes that the grievance process is generally a dead end with regard to those matters. (Doc. No. 59 at 12.) And, he says, that dead end is also specific to him, because despite his years of trying to gain more privileges, including remaining discipline-free as instructed for four years, the defendants are clearly unwilling to change his Level C classification. (*Id.* at 12–13.) The defendants say those assertions are untrue, as evidenced by Defendant Mays's previous agreement—later rescinded—to provide the plaintiff with some additional privileges while keeping his Level C status. (Doc. No. 66 at 8.) But the evidence on which the defendants rely is the documentation of long-term negotiations between the plaintiff, his attorney, and prison staff. (Doc. No. 33-1 at 18–21.) It has nothing to do with whether the grievance system the defendants fault the plaintiff for not exhausting could have produced the remedy he seeks. The defendants do not cite in their reply any policy establishing that Level C status or monthly level review decisions are grievable. Both TDOC Policy #501.01(VI)(H)(3) and the multiple grievances by the plaintiff and by Jon Hall rejected as non-grievable pursuant to that policy indicate that they are not.

Defendants Mays and Keys both testified at their depositions to the effect that they assumed an inmate dissatisfied with his level status should file a grievance. (Doc. No. 67-4 at 42–43; Doc. No. 67-3 at 18, 21, 39–40.) Mays testified that a death row inmate's level is not a matter of classification or custody level but is simply a "unit level," and that, accordingly, TDOC Policy #501.01(VI)(H)(3) does not prohibit grievances about unit level determinations. (Doc. No. 67-4 at

10

30, 41–42.) Both men testified that they were unaware of any way for an inmate to challenge a unit level determination other than filing a grievance. (Doc. No. 67-3 at 39–40; Doc. No. 67-4 at 53.) But Keys acknowledged that he was not involved in determining what grievances were non-grievable and had no training in that subject. (Doc. No. 67-3 at 25, 41.) He recognized that the plaintiff's February discrimination grievance was about his Level C status, but he was unaware that it was rejected because it was not in proper form. (*Id.* at 36–38.) And Warden Mays could only say that he was "curious" about why the Hall grievance was deemed non-grievable and that he did not know, after looking again at TDOC Policy #501.01(VI)(H)(3), whether the appropriate procedure to challenge a level status was actually in another set of policies rather than the ordinary grievance procedure. (Doc. No. 67-4 at 95–98.) By the end of his deposition, his testimony that unit level challenges should be brought by grievance rather than some other avenue was qualified by "[i]f I'm correct" and "I guess." (*Id.* at 99.)

This leads to the plaintiff's second argument, which is that even if some remedy is available with regard to his Level C status, the administrative system is so confusing that it is unworkable as a practical matter. (Doc. No. 59 at 13–17.) The defendants point to the prison's "remarkably detailed guidebook" and to plaintiff's ability to pursue grievances "with some significant skill as to several other unrelated issues" to suggest that he was capable of seeking a review of his level status through the grievance process. (Doc. No. 66 at 9.) But the availability of administrative remedies for unrelated problems is not the point. The evidence developed thus far about remedies for *this* problem, as summarized above, is that grievances directly challenging unit level issues are routinely rejected as non-grievable, despite the belief by Mays and Keys that the cited policy does not prohibit such grievances. Couching a grievance about unit level in terms of a discrimination grievance also results in rejection, simply because it is apparent that the gravamen of the grievance

11

is the plaintiff's Level C status rather than Title VI discrimination. Another TDOC policy refers to a procedure to appeal unit level decisions on a particular form, but Mays and Keys deny any knowledge of that procedure, and the plaintiff's prison counselor told him the form did not exist. An effort to pursue an appeal without the referenced form was ignored by the defendants. And the defendants do not even attempt to explain any of these contradictions or apparent roadblocks in their reply. "Given all these inconsistent statements and positions, perhaps even the Defendants themselves cannot understand and navigate their own administrative process." *Snyder*, 945 F.3d at 965.

Finally, the plaintiff argues that he was entitled to rely on the representations of prison staff about the availability of remedies. (Doc. No. 59 at 18.) Defendant Mays conceded that point in his deposition. (Doc. No. 67-4 at 37–38.) And the plaintiff has submitted evidence that defendant Mays told him his Level C status was non-grievable, that his and Hall's grievances about their Level C status were returned as non-grievable, that his prison counselor told him no form existed to appeal his level review determination, and that his makeshift appeal was ignored by the defendants. The defendants do not address or refute any of those facts. They simply argue, again, that the plaintiff's record of grievances establishes that he had "seemingly unlimited avenues for filing complaints." (Doc. No. 66 at 9.) But, again, the plaintiff's ability to exhaust remedies on other matters is not the point, and having "unlimited avenues" for complaints is meaningless when all those avenues lead to dead ends.

The defendants also assert that the deposition testimony "does not support" the plaintiff's position, but they do not point to any testimony that refutes it. (*Id*.) Neither the prison counselor nor the grievance chairperson was deposed. Defendant Mays, who was questioned by counsel for both parties, was never asked explicitly whether he told the plaintiff that his level status was non-

12

grievable, but he testified that he never told the plaintiff to file a grievance, and he acknowledged that he "would never tell anyone if you're not happy with what you have, file a grievance." (Doc. No. 67-4 at 60, 62, 74.) He went on to explain:

> I would never tell an inmate to file a grievance. We should be able to work anything out that need [sic] to be worked out if it could be worked out. A lot of people don't want to hear the right thing.

(*Id.* at 64.) He testified repeatedly that the only advice he ever gave in response to verbal complaints by the plaintiff about wanting to progress to another level was to earn it by exhibiting good conduct and character: "be a good offender." (*Id.* at 54–55, 61.) This testimony does not explicitly prove the plaintiff's declaration that Mays told him the issue was non-grievable, but it is certainly consistent with it.

Based on all the evidence and arguments presented, the court cannot determine whether the RMSI grievance committee actually has the authority, under TDOC policy, to consider a grievance about a death row inmate's level status. If they do have such authority, they routinely decline to exercise it. The court also cannot find any definite answer about whether some other appeal procedure, referenced by policy but unknown to either defendant or to the plaintiff's counselor, exists to challenge level review determinations. Between that confusion and the prison's failure to provide a substantive response through either avenue, the court finds that there is, at the very least, a genuinely disputed issue about whether administrative remedies are simply "unavailable" to the plaintiff as defined by *Ross*. The defendants are thus not entitled to summary judgment on the basis of the plaintiff's failure to exhaust.

### B.     Whether the Plaintiff Exhausted Available Remedies

In the alternative, the plaintiff argues that he did exhaust his available remedies by submitting his February 2019 grievance and his April 2019 makeshift appeal. (Doc. No. 59 at 18–

20.) In reviewing an exhaustion dispute, a district "court requires an inmate to make affirmative efforts to comply with the administrative procedures, and analyzes whether those efforts to exhaust were sufficient under the circumstances." *Mattox v. Edelman*, 851 F.3d 583, 590 (6th Cir. 2017) (internal punctuation and citations omitted). A grievance properly exhausts a prisoner's administrative remedies when it is "sufficient to give prison officials notice" of the challenged conduct. *Id.* at 596 (finding district court erred in granting summary judgment for defendants).

The defendants argue that the plaintiff's labeling his February grievance as a Title VI grievance prevented it from constituting exhaustion for his current claims. (Doc. No. 66 at 10.) They base their position on the fact that the "Title VI system exists intentionally separately and independently of the prison grievance system." (Doc. No. 66 at 10.) They argue that "[a]s was made clear in the testimony of Mays and Keys, such grievances would in most cases never be seen by a unit manager or a warden; they would be addressed—as happened here, at Plaintiff's direct request—by a Title VI coordinator and his Title VI supervisors." (*Id.*) This argument is unhelpful to the defendants for several reasons.

First, the defendants' argument is not supported by any citation to deposition testimony by Mays or Keys. Although it is followed more than a page later by short summaries of those depositions, neither summary includes any discussion of the February grievance in particular or Title VI grievances in general. (*Id.* at 11–12.) In fact, although Warden Mays did not recall seeing the February grievance, he acknowledged that his signature was on it and that it included his standard "response to anybody who wants special privileges." (Doc. No. 67-4 at 68–69.) Defendant Keys testified that the grievance looked familiar to him, that he had actually been interviewed by the Title VI coordinator about it, and that he understood it to be a grievance about

14

the plaintiff's Level C restriction. (Doc. No. 67-3 at 36–37.) The defendants' own argument, therefore, is not supported by their testimony.

Further, the defendants have not persuaded the court that who sees or does not see a grievance determines whether a complaint is exhausted by the grievance process. They seem to assume that the defendants themselves must have been required to review or respond to a grievance in order to be subject to suit about its subject matter, but they do not provide any basis for that assumption. The Supreme Court has expressly rejected the argument that the PLRA requires a future plaintiff to name his defendants in a grievance in order to exhaust his remedies. *Jones v. Bock*, 549 U.S. 199, 218 (2007). Moreover, both Mays and Keys testified to the effect that, according to policy, grievances complaining about their own behavior should not go to them, but to a supervisor with authority to correct the problem. (Doc. No. 67-3 at 36; Doc. No. 67-4 at 71.) Thus the question of who would ordinarily see a Title VI grievance at RMSI seems inconsequential, and the defendants have not offered any other basis for finding that the February grievance did not exhaust the plaintiff's administrative remedies.

Moreover, the defendants do not address the April appeal at all. They do not admit or deny that TDOC policy provides for an appeal of a level review determination, separate from the grievance system, or explain why the plaintiff's attempt to raise such an appeal was not sufficient to exhaust his remedies.

The record indicates that the plaintiff included his discrimination claims in the February grievance to trigger some review, because he knew that a grievance that only challenged his level status would be rejected as non-grievable. When that failed, he submitted the April appeal, which the defendants wholly ignored. A reasonable jury could find that either or both of the plaintiff's affirmative efforts to exhaust were sufficient under the circumstances. Accordingly, even if a

15

remedy were available under *Ross*, the defendants have failed to demonstrate "that no reasonable jury could find that the plaintiff exhausted his administrative remedies." *Mattox*, 851 F.3d at 590 (citing *Surles v. Andison*, 678 F.3d 452, 455–56 (6th Cir. 2012)).

## IV. CONCLUSION

For the foregoing reasons, the defendants' Motion for Summary Judgment (Docket No. 31) is hereby **DENIED**.

It is so **ORDERED**.

_____
ALETA A. TRAUGER
UNITED STATES DISTRICT JUDGE

16

Case 3:19-cv-00598 Document 75 Filed 08/17/20 Page 16 of 16 PageID #: 1850