# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | | |
|---|---|---|
| STEPHEN HUGUELEY, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | NO. 3:19-cv-00598 JUDGE TRAUGER |
| TONY PARKER, et al., | ) ) ) | |
| Defendants | ) | |

## ORDER AND MEMORANDUM

This matter is before the court on the plaintiff's Renewed Motion to Compel discovery (Doc. No. 92), which the defendants oppose. (Doc. No. 93). The trial court may determine the proper scope of discovery, guided by Rule 26(b)'s direction that parties may discover "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ." Fed. R. Civ. P. 26(b)(1). "Although a plaintiff should not be denied access to information necessary to establish her claim, neither may a plaintiff be permitted 'to go fishing and a trial court retains discretion to determine that a discovery request is too broad and oppressive.'" *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 305 (6th Cir. 2007) (quoting *Marshall v. Westinghouse Elec. Corp.*, 576 F.2d 588, 592 (5th Cir. 1978)).

This case concerns several alleged constitutional violations in connection with the plaintiff's long-term incarceration in solitary confinement on death row at the Riverbend Maximum Security Institution (RMSI). One of the plaintiff's claims is that the defendants have violated his right to equal protection under the Fourteenth Amendment. (Doc. No. 48 at 21–23). As part of that claim, he alleges that the defendants have treated him "differently from others similarly situated," without rational basis or penological justification, and that "[u]nder the same and/or similar circumstances, Defendants have granted level changes and/or released prisoners

from solitary confinement that had a high degree of similarity to Mr. Hugueley." (*Id.*) In institutional communications that have been made part of the record, the plaintiff indicated some general basis for that belief:

> There have been many inmates on Tennessee's death row who have lost their levels repeatedly for infractions such as drugs, cell phones, assaults, contraband, having sex on visits, etc., yet these inmates are repeatedly given their levels back and allowed to have their unrestrained contact visits while I am consistently denied the same opportunity.

(Doc. No. 3-1 at 13–14). He also identified a particular inmate who had "once again been given his A-level status" even after a disciplinary incident. (*Id.* at 13).

The focus of the parties' current discovery dispute, number 35 of the plaintiff's request for production of documents, is clearly designed to elicit information to support the equal protection allegations:

> Request for Production No. 35: Documents sufficient to identify the prisoners on death row for each year between 2002 to present, and for each such prisoner, documents sufficient to evidence:
>
> (a) prior conviction history, including dates of conviction and sentences;
>
> (b) complete formal and informal disciplinary record while in TDOC custody, including written responses;
>
> (c) Levels A, B or C on death row and the dates and reasons for any changes in Level;
>
> (d) disciplinary actions taken prior to, in addition to or other than, placement in Solitary Confinement;
>
> (e) decisions and/or recommendations by Unit Review Panels or prison officials related to release from or continued confinement in Solitary Confinement;
>
> (f) policies, procedures, directives or training materials relied upon or referenced in making decisions related to use of, release from or retention in Solitary Confinement while on death row; and
>
> (g) the prisoner's risk levels while on death row.

(Doc. No. 93 at 3.) In subsequent efforts to resolve the dispute, the plaintiff has narrowed his request to information about 110 inmates, which is far fewer than the 297 inmates whose records

2

would apparently have been implicated in the original request. (Doc. No. 92-1; Doc. No. 93 at 2; Doc. No. 93-2 at 2). He also requests that production of the records for ten specific inmates be prioritized over the others. (Doc. No. 92 at 2–3).

The defendants object to the plaintiff's request on several bases. First, they say the information sought is irrelevant to the plaintiff's claims. (Doc. No. 93 at 1). That assertion is clearly unfounded, given that the plaintiff bears the burden with respect to his equal protection claim of establishing that he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000). Indeed, the defendants affirmatively argue later in their Response that "Plaintiff will have to find a substantially similarly situated inmate" to prove his claim. (Doc. No. 93 at 6). They suggest that he will be unable to do so, but they cannot be permitted to defend the claim on that basis while withholding all the pertinent evidence from which the truth could be determined.

The defendants also argue that the plaintiff himself is in the best position to identify similar inmates and that his discovery request is essentially a fishing expedition in hopes of finding evidence to support an allegation he made "absent any actual evidentiary basis for the claim." (*Id.*) But, as the court observed above, both the operative complaint and the plaintiff's institutional records indicate that he had sufficient personal knowledge of disparate treatment to make his equal protection claim in good faith. Still, the plaintiff is an indigent inmate who has been held in solitary confinement for decades "with limited access to technology and an inability to communicate with other inmates." (Doc. No. 94 at 3). It would be laughable to suggest that the plaintiff's own testimony about what he knows, or thinks he knows, of other inmates' behavior and treatment would be given the same weight by a fact-finder as the official records of that behavior and

3

treatment. The defendants argue that the plaintiff should at least use his own knowledge to narrow down his request, but the plaintiff has already agreed to narrow his request from 297 inmates to 110—a reduction of almost two-thirds[1]—and has identified ten specific inmates in whose records he has a particular interest. In any event, discovery should not be limited to what the requesting party already personally knows.

Finally, the defendants argue that producing the requested documents would be unduly burdensome and expensive. To that end, they rely in part on a letter dated December 21, 2019, from counsel for the Tennessee Department of Correction (TDOC) to the plaintiff's counsel in response to a request under the Tennessee Public Records Act. (Doc. No. 93-1). That letter indicates, in pertinent part, that responsive records to sub-parts (a), (b), (d), (f), and (g) of the original discovery request had either already been produced or had already been or could fairly quickly be compiled and produced for a total cost of $1,971.72. (*Id.* at 3). Responses to sub-parts (c) and (e) were anticipated to be more costly to produce:

> The responsive records for these two requests will be very voluminous and take a significant amount of time to compile. It will require going through each inmate's file and pulling the responsive documents. A number of the inmates are no longer on death row or are deceased. Those files will be either at archives or another institution requiring multiple staff to complete these two requests. I approximate being able to compile the responsive documents by March 10, 2020. I estimate the cost for labor and copies to be around $4,000.

(*Id.*) Thus, TDOC estimated that producing this material—comprising the unit level recommendations and placements most germane to the plaintiff's claim—for 297 inmates as originally requested would take approximately eleven weeks and cost around $4,000.

In a more recent document on which the defendants rely, another attorney for TDOC testifies by affidavit that, through information available in the Tennessee Offender Management

---

[1] Specifically, this constitutes a reduction by 63% as compared to the original discovery request.

4

Information System (TOMIS), he has been able to determine the current location of each inmate who is still in TDOC from the plaintiff's list of 110, and that 58 are still in TDOC under a sentence of death. (Doc. No. 93-3 at 2). It appears that 56 of the inmates on the plaintiff's list are currently housed at RMSI, which is "the largest number of subject records in one location." (Doc. No. 93-3 at 2, 5–8). Nevertheless, TDOC now maintains that just to gather and produce the records for the RMSI inmates would take ten weeks. (*Id.* at 2). The affidavit, dated November 12, 2020, cites "scheduling constraints occasioned by intervening holidays," which are now passed so should no longer be a concern. (*Id.* at 2–3). It also references "prevailing time constraints occasioned by the institution's pandemic management work," (*id.*), but the defendants do not explain how pandemic restrictions could possibly make it take almost the same amount of time to gather and produce records from 56 on-site files as it was previously expected to gather and produce records for 297 inmates scattered across multiple locations. The defendants do not address the cost to them associated with this smaller production, but it would presumably be a fraction of the cost originally anticipated. The court sees no justification for the refusal to produce those records in a timely fashion.

Fifteen of the inmates on the list are housed at TDOC facilities other than RMSI, but the TDOC acknowledges that "[i]t is not expected that the production task for these 15 record sets would be particularly difficult or time consuming." (*Id.* at 4). Again, then, there is no basis for refusing to produce those records.

The defendants have a better point, however, with regard to records that would have to be retrieved from archives, which comprise "the second largest number of subject records in one location." (Doc. No. 93-3 at 3). That includes records for former inmates who have died or been released. (*Id.*) As counsel for TDOC explains, those records were damaged when the building in

5

which they were housed was partially destroyed by a tornado in March 2020. (*Id.*) The archived records were left water-damaged and in disarray and had to be shipped to a vendor outside the state to be preserved and returned for "identification, reconstruction, and scanning." (*Id.*) There is no indication of when those records were returned or where TDOC is in the process of re-organizing them, but it maintains that it "will first need to compile an index of all the recovered records before they can estimate a timeline for reproduction of the requested subject records." (*Id.*)

Finally, the plaintiff observes that much of the information they seek is easily accessible by the defendants electronically through TOMIS. (Doc. No. 94 at 5). Warden Mays's deposition testimony indicates that on TOMIS he can see criminal histories, disciplinary reports, unit level review panel reports, any daily contact notes—"I can see anything that I need to find in regards to an offender." (Doc. No. 94-1 at 6–8, 14–15). The defendants' own submissions seem to confirm that TDOC officials are available to access TOMIS records even for former inmates who are now deceased or discharged, which they did to confirm the current status of all 110 inmates on the plaintiff's list. (Doc. No. 93-3 at 2). There is no reason in this record to believe that TOMIS electronic records are ever deleted or become inaccessible simply because an inmate is no longer in the TDOC's custody. And the defendants have not raised any issue of undue difficulty or expense associated with producing records that are available to them electronically.

For these reasons, the court finds that the requested information is relevant to the plaintiff's claims, and that, with the possible exception of the damaged archived records, the request has been reasonably tailored to be proportional to the needs of the case and is not unduly burdensome or costly to the defendants. The plaintiff's Renewed Motion to Compel (Doc. No. 92) is therefore **GRANTED** in part and **DENIED** in part, as follows:

1. Within 30 days of entry of this order, the defendants **MUST** produce the following records with respect to the 110 individuals on the plaintiff's list, to the extent that they

6

have not already been produced and are not affected by part 2 below:

    a. All responsive records available to the TDOC through TOMIS; and

    b. All responsive records pertaining to inmates whose physical records are at any TDOC facility.

2. With regard to requested records that were physically damaged in archives, the defendants **MUST**, within 30 days of entry of this order, advise counsel for the plaintiff of the current status of efforts to reorganize those records and how long they anticipate it will take to gather and produce the affected records for Marlon Kiser, Philip Workman, and Nicholas Sutton, followed by the remaining affected records as a second level of priority. The plaintiff's request to compel production of these records is **DENIED** without prejudice to his ability to seek further relief as appropriate in light of the defendants' report, the production already being required, and the burden to the defendants of producing additional records.

It is so **ORDERED**.

_____
ALETA A. TRAUGER
UNITED STATES DISTRICT JUDGE

7

Case 3:19-cv-00598   Document 104   Filed 02/02/21   Page 7 of 7 PageID #: 2084